IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 22 CR 30024-SPM-01 |
| | ) |
| STEVEN DORFMAN, | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorneys, Rachelle Aud Crowe, United States Attorney for the Southern District of Illinois, and Scott A. Verseman, Assistant United States Attorney for the Southern District of Illinois, submits for the Court's consideration this Sentencing Memorandum.

**I.      RECOMMENDATION**

In the Pre-Sentence Investigation Report, the Probation Officer has determined that Defendant Dorfman's applicable Sentencing Guidelines range is 324 – 405 months of imprisonment. PSR at ¶ 94.[1] At the sentencing hearing in this case, the United States will recommend a sentence of imprisonment of 360 months, or 30 years. R. 95, 97.

---

[1] The Pre-Sentence Investigation Report for Defendant Dorfman is contained in the original court record of this case at document number 181. All citations to the Presentence Investigation Report are denoted "PSR" and followed by the applicable paragraph number. Citations to all other documents contained in the district court record of this case are denoted "R." and followed by the applicable page number(s).

1

## II. 18 U.S.C. § 3553 SENTENCING FACTORS

In determining the appropriate sentence, a district court must consider the following enumerated statutory factors:

(1)  the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)  the need for the sentence imposed –

   (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

   (B)  to afford adequate deterrence to criminal conduct;

   (C)  to protect the public from further crimes of the defendant; and

   (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)  the kinds of sentences available;

(4)  the kinds of sentences and sentencing range established [by the Sentencing Guidelines];

(5)  any pertinent policy statement [issued by the Sentencing Commission];

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

## II. DISCUSSION OF THE § 3553 FACTORS

(1)  *Nature and Circumstances of the Offense, Seriousness of the Offense, and the Need for Just Punishment*

A jury found defendant Dorfman found guilty on all counts contained in the indictment in this case. PSR at ¶ 6. The evidence at trial established that Dorfman was the leader and organizer of a massive conspiracy and scheme to defraud. In terms of the dollar value of the damage

2

inflicted, this is the largest fraud scheme ever prosecuted in the Southern District of Illinois. In terms of the amount of harm inflicted upon the victims, it is also one of the most heinous and cruel fraud schemes ever prosecuted in this district.

Dorfman was the owner and CEO of a Florida telemarketing business known as Simple Health.[2] PSR at ¶¶ 14, 84. Simple Health sold Limited Indemnity policies. PSR at ¶ 10. In order to maximize sales and profits, Dorfman caused Simple Health to utilize a deceptive sales script that misled consumers into believing that the policies covered substantially more than they actually covered. PSR at ¶ 20.

Simple Health operated telephone call centers in several locations in South Florida, including Hollywood, Boca Raton, and Doral. PSR at ¶ 11. Simple Health also had offices in Dallas, Texas, the Dominican Republic, and Panama. PSR at ¶ 11.

Simple Health entered into contracts to sell health insurance products through telemarketing. PSR at ¶ 11. One of the companies for which Simple Health sold insurance products was Health Insurance Innovations ("HII"). PSR at ¶ 12. HII provided sales and administrative services to insurance companies. PSR at ¶ 12. Simple Health sold Limited Indemnity Insurance policies on HII's behalf.

The Limited Indemnity Insurance policies that Simple Health sold functioned very differently from traditional Comprehensive Health or Major Medical plans that most people think of as constituting health insurance. Unlike Comprehensive Health plans, which cover the majority of the insureds' medical bills, Limited Indemnity Plans pay only a predetermined, fixed amount for certain health care expenses. PSR at ¶ 17. After the insurance company paid the predetermined

---

[2] During its existence, the business operated under various names, including Simple Health Plans and Health Benefits Center. For ease of reference in this Memorandum, the United States will refer to the business as "Simple Health."

amount, the patient was responsible for paying all of his or her medical expenses above that amount. PSR at ¶ 17.

For purposes of marketing the Limited Indemnity Insurance policies, Dorfman contracted with individuals and companies who operated lead generation websites. PSR at ¶¶ 18, 19. Dorfman also started his own company that created lead generation websites. PSR at ¶ 18. That company was known as Simple Insurance Leads, LLC.

The lead generation websites were designed to appear when individuals searched the internet for certain terms related to health insurance. PSR at ¶¶ 18, 19. These websites typically offered individuals a free quote on health insurance if they filled out an online form and/or provided certain information. After individuals filled out these forms or provided the requested information, employees affiliated with Simple Health called the individuals and offered to help them get a health insurance quote. These employees took some basic information from the individuals and then transferred them to salespersons at Simple Health. PSR at ¶ 20.

The lead generation websites which generated leads for Simple Health often contained false, misleading, and deceptive information. PSR at ¶¶ 18, 19. For example, many of the lead generation websites contained references to programs such as the Affordable Care Act (or "ACA"), "Obamacare," and legitimate businesses and organizations, such as the AARP and Blue Cross/Blue Shield. *Id.* The Federal Trade Commission's ("FTC") investigation revealed that Simple Health obtained 117,990 leads from websites that used the Blue Cross/Blue Shield logo and 218,190 leads from websites that referenced "Obamacare" or the Affordable Care Act ("ACA"). PSR at ¶ 19. If the individuals opened these sites, the references to these legitimate programs and businesses gave the false impression that the sites were affiliated with those programs and businesses. PSR at ¶ 18.

When they spoke with individuals located through the lead generation websites, the Simple Health salespersons used materially false and deceptive sales scripts. PSR at ¶ 20. Defendant Dorfman revised, edited, and tightly controlled all of the wording contained in these scripts. PSR at ¶ 29. The scripts were designed to create the false impression that the Limited Benefit Plans sold by Simple Health covered more medical services, and paid larger portions of the customers' medical bills, than they actually did. PSR at ¶ 20. Essentially, the scripts implied that the policies would function like comprehensive/major medical insurance. PSR at ¶ 20. The scripts misstated the benefits and coverages that were actually provided. *Id.* In addition, as Dorfman was well aware, many of the Simple Health salespersons made additional false statements and misrepresentations, beyond those contained in the scripts, for the purpose of selling the Limited Indemnity plans. PSR at ¶ 23.

The employees who worked in Simple Health's Customer Service Department took calls all day long from customers who complained that the policies did not cover as much of their medical expenses as they were led to believe, and that their doctors, hospitals, and other healthcare providers were not part of the discount network associated with the policies. PSR at ¶ 22. The Customer Service Department received an estimated 300 to 500 calls per day from customers complaining about the coverages (or lack thereof) provided by the Limited Indemnity Plans sold by Simple Health. PSR at ¶ 22. At one point, there were so many people who called into Simple Health who were crying about the lack of coverage provided by these plans that HII and Simple Health developed a protocol for handling these crying customers. Tr. Day 6 at 165[3]; Exhibit 385.[4]

---

[3]  All citations to the transcripts of Dorfman's trial are denoted "Tr.," followed by the applicable day of the trial, and then followed by the relevant page number(s) of the transcripts.

[4]  All citations to exhibits introduced into evidence at Dorfman's trial are denoted "Exhibit" and followed by the applicable exhibit number.

Despite his knowledge that customers had been lied to and misled during the sales process, and despite his knowledge that the Limited Indemnity Plans did not provide the type of comprehensive coverage that most of the customers needed, Defendant instructed the employees of the Customer Service Department to mollify the customers and try to convince them that the limited indemnity plans they had been sold had significant value and provided good coverage. PSR at ¶ 22. At Dorfman's insistence, Cam Girouard created a "Saves Team" within the Customer Service Department. As he did with the sales scripts, Dorfman maintained tight control over the scripts used by the Saves Team. Exhibit 389. He also continually pressured Girouard and the Saves Teams leaders to "save" as many policies from cancellation as possible. *See, e.g.*, Exhibits 379, 394.

Dorfman's fraud model was to deceive people who needed and were looking for Major Medical policies into purchasing his Limited Indemnity plans. And he was extremely successful at it. Over a six year period, the company earned over $195,000,000 in commissions. PSR at ¶ 24. Dorfman used the profits generated by the Simple Health fraud scheme to fund his extravagant personal lifestyle, spending hundreds of thousands of dollars at casinos and night clubs, and driving luxury automobiles, including a Lamborghini and a Rolls Royce. Tr. Day 8, testimony of Emil George, at 20 – 26.

Predictably, Dorfman's crimes had devastating effects on his thousands of victims. The victims from southern Illinois who testified at the trial are representative of these victims. R.P., of Waterloo, Illinois, testified that the Limited Indemnity Plan he purchased from Simple Health covered virtually none of the costs of his toe amputation surgery. This was despite the fact that he'd been led to believe that the policy would function like Major Medical. S.B., of Louisville, Illinois, testified that she and her husband still owe close to $25,000 for medical bills related to her

fibromyalgia that were not covered by the Limited Indemnity plan she purchased from Simple Health. M.I. and D.I. of Bethalto, Illinois, incurred over $20,000 worth of medical expenses for their children that were not covered. T.D., of Marion, Illinois, had to be hospitalized for high blood pressure and heart racing when he realized that he would have to pay over $20,000 worth of medical expenses out of his own pocket. And C.J., of Alton, Illinois, broke down crying on the witness stand as she explained that she is still being hounded by collection agencies over medical costs that her Limited Indemnity plan from Simple Health did not cover.

The level of cruelty demonstrated by defendant Dorfman in the present case is rarely seen in a fraud case. Dorfman's fraud had devastating effects upon thousands and thousands of victims. Dorfman caused his sales agents to use misleading sales scripts to trick people into purchasing the Limited Indemnity plans sold by Simple Health. Based upon this deception, the victims thought they were purchasing policies that would cover most of their medical expenses – policies that functioned similarly to Major Medical policies. Sadly, nothing could have been further from the truth. Most of the victims did not discover they'd been duped until it was too late. When they became seriously ill, or suffered a serious accident, these victims tried to use the Limited Indemnity plans to pay for their medical expenses. Only then, when they were informed that the Limited Indemnity plans paid only a pittance of their medical bills, did these individuals realize they'd been defrauded. The impact on these individuals was devastating, both financially and emotionally.

The evil nature of the fraud could be excused if Dorfman did not understand that the level of suffering he was inflicting upon the victims. But he knew. He knew. He knew because the employees who worked for him constantly told him about it. At trial, Cam Girouard testified that she had many conversations with Dorfman where she told him that the customers were being

7

misled by the scripts. Tr. Day 6 at 36 – 37. At one point, HII insisted that Simple Health take the "up to 70%" language out of the scripts, because it was so misleading to the customers. Despite this fact, Dorfman instructed John Sand to put the "up to 70%" language back in the scripts, because the sales numbers had dropped too low. Tr. Day 6 at 50, 113. Further, on a daily basis, Dorfman was sent a spreadsheet entitled "Daily Drop Off Report." Tr. Day 7 108 – 129; Exhibits 300 – 355. This report listed all of the customers who'd cancelled their policies within the past 30 days, and gave the reasons for their cancellations. Time after time after time after time, these reports indicated that the customers cancelled because the policy benefits had been misrepresented to him. *Id.*

It is simply undeniable that Dorfman knew full well that his scripts were duping people into purchasing Simple Health's Limited Indemnity plans. And he knew full well the horrendous effect he was having only people's lives. After all, so many people called in *crying* about the lack of coverage provided by the Limited Indemnity plans, that HII and Simple Health had to develop a protocol for handling these crying customers.

The only conclusion that can be drawn from these facts is that Dorfman knew that he was wrecking people's lives, and he simply did not care. He wanted massive sales numbers to fuel his extravagant lifestyle. And that's what he got. The level of greed displayed by Dorfman in this case is unfathomable. His lack of compassion for the individuals he victimized is horrifying.

The conspiracy and scheme to defraud operated from approximately May 4, 2012, through at least November 1, 2018. PSR at ¶ 24. During this period, through the use of its deceptive and misleading sales tactics and false pretenses, Simple Health sold health insurance products to more than 420,000 individuals. Tr. Day 4 at 221 – 226; Tr. Day 8 at 121; Exhibit 620. These sales generated revenues for Simple Health of more than $195,000,000. PSR at ¶ 24. The victims were

8

located in all fifty of the United States. *Id.* At least 1175 victims of the scam were located within the Southern District of Illinois and resided in all 38 counties in the district. *Id.*

Defendant Dorfman's crime was incredibly serious and caused significant harm to thousands upon thousands of people. Just punishment requires a sentence of imprisonment of 30 years.

 (2) *History and Characteristics of the Defendant*

Defendant Dorfman has no criminal history points and his criminal history category is I. PSR ¶¶ at 61, 62. He has only one prior conviction. PSR at ¶ 60. That was for resisting a peace officer, a situation that involved a high speed chase initiated by Dorfman.

It is important to note that Dorfman lied to the Probation Officer with regard to his prior employment history. Prior to founding Simple Health, Dorfman worked as a telemarketer for at least one other company that sold Limited Indemnity Plans. Tr. Day 6 at 20 – 21; Tr. Day 10 at 66 – 67. As Cam Girouard testified, even before he started Simple Health, Dorfman had a reputation in the industry for not "being compliant" when he sold Limited Indemnity plans. Tr. Day 6 at 21. It is deeply troubling that Dorfman concealed from the Probation Officer his prior involvement in the very industry upon which this entire case was centered.

 (3) *General Deterrence*

Section 3553(a)(2)(B) states that a district court must consider the need for the sentence "to afford adequate deterrence to criminal conduct. . . ." The Seventh Circuit has recognized that this factor is aimed at providing general deterrence to criminal conduct. *See United States v. Harris,* 587 Fed.Appx. 327, 328 (7th Cir. 2014)(citing with approval the district court's application of § 3553(a)(2)(B) to impose a sentence reflecting the need for general deterrence because of the prevalence of drug dealing in the community); *United States v. Anderson,* 517 F.3d 953, 966 (7th

Cir. 2008)(upholding sentence where district court cited to need for general deterrence of public corruption scandals).

"We previously have endorsed the idea that white-collar criminals 'act rationally, calculating and comparing the risks and the rewards before deciding whether to engage in criminal activity.'" *United States v. Brown,* 880 F.3d 399, 405 (7th Cir. 2018)(*quoting United States v. Warner,* 792 F.3d 847, 860-61 (7th Cir. 2015)). "They are, therefore, 'prime candidates for general deterrence.'" *Brown,* 880 F.3d at 405 (*quoting Warner,* 792 F.3d at 860 and *United States v. Peppel,* 707 F.3d 627, 637 (6th Cir. 2013)). *See also United States v. Patel,* 746 Fed.Appx. 569, 573-74 (7th Cir. 2018)(upholding district court's rejection of defense argument that general deterrence does not work in white collar cases and stating "section 3553(a) itself . . . expressly recognizes deterrence as a factor to be considered); *United States v. Schultz,* 743 Fed.Appx. 5, 9 (7th Cir. 2018)(rejecting defense's attack on general deterrence in a white collar case and stating: "[T]his position runs headlong into Congress' express enumeration in 18 U.S.C. § 3553(a)(2)(B) of deterrence (general and specific) as a proper sentencing factor. The district court's consideration of general deterrence was therefore entirely appropriate.")

There is a tremendous need for deterrence of the type of fraud scheme that was perpetrated in this case. While limited indemnity plans are legal, these policies were never intended to be a substitute for comprehensive or major medical insurance. In fact, some of the policies sold by Simple Health contained this warning: "**THIS IS A SUPPLEMENT TO HEALTH INSURANCE AND IS NOT A SUBSTITUTE FOR MAJOR MEDICAL COVERAGE.**" *See* Govt. Ex. 123 at p. 20. Despite this fact, in an effort to maximize their profits, the owners and operators of the telemarketing firms that sell these policies frequently utilize fraudulent and deceptive sales scripts to sell the policies. These misleading sales scripts conceal the limited nature

10

of the benefits provided by the policies. In addition, these scripts are worded in such a way as to make consumers think the policies will function like major medical.

This type of fraud scheme is rampant in the United States. *See e.g.,* https://disb.dc.gov/page/beware-fake-health-plans; https://www.brookings.edu/articles/fixed-indemnity-health-coverage-is-a-problematic-form-of-junk-insurance/; https://chirblog.org/response-deceptive-marketing-limited-plans-shows-states-can-take-proactive-steps-protect-consumers/; https://www.reddit.com/r/YouShouldKnow/comments/zm076m/ysk_some_health_insurance_plans_are_actually/?rdt=34186; https://www.aarp.org/money/scams-fraud/info-2019/health-insurance.html. As these articles demonstrate, these limited indemnity plans are sold in lieu of major medical to thousands upon thousands of Americans each year. This practice is exceptionally dangerous, because it leaves these Americans exposed to financial ruin and bankruptcy in the event that they suffer serious injuries or illnesses.

There is a substantial need for general deterrence of schemes involving the fraudulent sale of limited indemnity plans. This factor weighs heavily in favor of a significant prison sentence.

    (4)    *Specific Deterrence*

Section 3553(a)(2)(C) directs district courts to consider the need for the sentence "to protect the public from further crimes of the defendant." One important indicator of a need for specific deterrence is the defendant's past conduct. Specifically, if a defendant has committed crimes similar to the instant offense(s), or has engaged in conduct similar to that which led to his conviction in the instant case, this demonstrates a need for the court to fashion a sentence that deters her from engaging in the same offenses and/or conduct.

As noted above, although not reflected in his PSR, Dorfman was previously employed at least one business that telemarketed Limited Indemnity plans. Tr. Day 6 at 20 – 21; Tr. Day 10 at 66 – 67. Not only that, but, as Cam Girouard testified, Dorfman had a reputation in the industry for not "being compliant" before he even started Simple Health. Tr. Day 6 at 21.

Dorfman has a long history of defrauding consumers in connection with health insurance sales. This history extends prior to the six year period during which he operated Simple Health. Thus, there is a tremendous need to deter Dorfman from engaging in further fraudulent telemarketing. This factor weighs heavily in favor of a lengthy sentence of imprisonment.

(5)  *Sentencing Guidelines and Relevant policy statements issued by the Sentencing Commission*

Prior to the enactment of the Sentencing Guidelines, Congress determined that tax and other white collar offenses were offenses for which existing "sentences did not accurately reflect the seriousness of the offense." Congress also observed that in many such cases, "probation had been granted . . . without due consideration being given to the fact that the heightened deterrence effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance." S. Rep. No. 225, 98th Cong., 1st Sess., 91-92 (1983).

Consistent with its statutory mandate that sentences promote general deterrence, *see* 18 U.S.C. 3553(a)(2)(B), the Sentencing Commission articulated that, despite the general appropriateness of imposing a non-prison sentence for non-violent first offenders, *see* 28 U.S.C. 994(j), at least some short term of imprisonment was appropriate for first time offenders convicted of economic crimes such as tax evasion:

> . . . Under pre-guidelines sentencing practice, courts sentenced to probation an inappropriately high percentage of offenders guilty of certain economic crimes, such as theft, tax evasion, antitrust offenses, insider trading, fraud, and embezzlement, that in the Commission's view are "serious."

12

> The Commission's solution to this problem has been to write guidelines that classify as serious many offenses for which probation was frequently given and provide for at least a short period of imprisonment in such cases. The Commission concluded that the definite prospect of prison, even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.

U.S.S.G. Ch. 1, Pt. A, § 4(d), intro. Comment. (Nov. 2018 ed.)

The relevant policy statements of both the Sentencing Commission and the United States Congress make it clear that sentences of imprisonment should be imposed upon individuals like Dorfman who conduct large fraud schemes. And, in this particular case, because of the astronomical amount of losses caused by this conspiracy to defraud, and the tremendous amount of suffering caused to the victims, the Guidelines promulgated by the Sentencing Commission recommend a prison sentence of between 324 and 405 months. The 360 month sentence requested by the United States is right in the middle of this range. The United States requests that this Court give serious consideration to the policy statements and Guidelines promulgated by the Sentencing Commission when imposing sentence in the present case.

  (6) *<u>Restitution</u>*

Ordinarily, an order of restitution is a very important part of a criminal sentence. Restitution helps to reduce the financial loss a defendant's crimes have caused for the victims. *See* 18 U.S.C. § 3663A(b)(1).

In the present case, however, the United States is not seeking an order of restitution. There are two reasons for this position. First, Title 18, United States Code, Section 3663A(c)(3) states:

> This section shall not apply . . . if the court finds, from facts on the record, that –
>
> (A) the number of identifiable victims is so large as to make restitution impracticable; or

13

> (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

In the present case, Simple Health sold Limited Indemnity plans to more than 420,000 individuals. Because Simple Health used its deceptive and misleading sales scripts to make all of these sales, each one of these individuals was victimized by this fraud scheme. Such a large number of victims certainly would make restitution impracticable in this case.

Further, as this Court is aware, the FTC filed a civil action against Simple Health, Dorfman, and Girouard in the U.S. District Court for the Southern District of Florida. *See FTC v. Simple Health Plans, LLC,* 58 F.4th 1522 (11th Cir. 2023). As part of that lawsuit, the FTC is seeking rescission and reformation of the contracts between Simple Health and its customers, and is seeking refunds of the customers' monies. *Id.* at 1329. For purposes of refunding the customers' monies, the district court granted the FTC's request for the appointment of a receiver. The district court authorized the receiver to freeze Simple Health's and Dorfman's assets to be used for purposes of repaying the consumers. *Id.* at 1329-30. *See also* Tr. Day 9 (testimony of Michael Goldberg) at 4 – 57. Because the receiver in the FTC's civil case is already engaged in the process of repaying the defrauded consumers, an order of restitution in this case would be duplicative.

## III. CONCLUSION

For the foregoing reasons, the United States respectfully recommends that this Court impose a sentence of imprisonment of 360 months, or 30 years, in the present case.

Respectfully submitted,

RACHELLE AUD CROWE
United States Attorney


s/ *Scott A. Verseman*

SCOTT VERSEMAN
Assistant United States Attorney
Nine Executive Drive
Fairview Heights, IL  62208
scott.verseman@usdoj.gov
(618) 628-3700
Fax:  (618) 628-3720

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 22 CR 30024-SPM-01 |
| | ) |
| STEVEN DORFMAN, | ) |
| | ) |
| Defendant. | ) |

**Certificate of Service**

I hereby certify that on June 25, 2024, I caused to be electronically filed the foregoing "Government's Sentencing Memorandum" to be filed with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to all attorneys of record.

Respectfully submitted,

RACHELLE AUD CROWE
United States Attorney


s/ Scott A. Verseman
SCOTT VERSEMAN
Assistant United States Attorneys
Nine Executive Drive
Fairview Heights, IL  62208
scott.verseman@usdoj.gov
(618) 628-3700
Fax:  (618) 628-3720